**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | **UNDER SEAL** |
| JIHOON PARK, | |
| Defendant. | 1:25-MJ-242 |

**AFFIDAVIT IN SUPPORT OF**
**A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Samantha Wendt, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June of 2023. I am currently assigned to the Washington Field Office. My primary duties include investigating violations of federal law, including securities fraud, wire fraud, bank fraud, and internet-enabled crimes. Part of those duties include investigating instances of wire fraud, typically in situations where perpetrators achieve financial gain at the expense of others.

2.      Before my career as an FBI Special Agent, I was employed as a Forensic Accountant by the FBI in the Seattle Field Office for two years. I am a Certified Public Accountant and a Certified Fraud Examiner. As part of that role, I conducted the financial portion of investigations, which included reviewing financial records and determining the sources and uses of funds. In that role, I was also part of the FBI's Virtual Currency Response Team as a specialist in blockchain analysis.

3.      I have participated in numerous investigations related to financial crimes and have experience analyzing financial documents, interviewing suspects and witnesses, and reviewing

evidence obtained from physical and digital search warrants. I have also participated in investigations that involve blockchain analysis and the seizure of cryptocurrencies.

4.      I make this affidavit in support of a criminal complaint and arrest warrant charging that, from in or about January 2019 and continuing through at least August 2024, in the Eastern District of Virginia and elsewhere, defendant **JIHOON PARK** (hereinafter "**PARK**") did knowingly and intentionally commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2. In sum, **PARK** executed a multi-million-dollar scheme to defraud affecting at least three investors, and, in particular, caused multiple interstate wires within the Eastern District of Virginia and elsewhere in furtherance of the scheme between January 2019 and September 2024.

5.      I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. The information set forth in this affidavit is based on my own personal knowledge, my review of relevant records, reliable information provided to me by other law enforcement personnel, interviews of victims and witnesses, and my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim. Where I assert that an event took place on a particular date or at a particular time, I am asserting it took place on or about the date alleged or at that approximate time.

## RELEVANT ENTITIES AND INDIVIDUALS

6.      **PARK** is a 51-year-old male with a current residence in Chantilly, Virginia, which is within the Eastern District of Virginia.

7.      J.K. is a 53-year-old female and is **PARK**'s spouse.

8.      Victim-1 is a 60-year-old resident of the Eastern District of Virginia.

2

9.      Victim-2 is a 72-year-old resident of the Eastern District of Virginia.

10.     Victim-3 is a 51-year-old resident of Potomac, Maryland.

11.     S.J. is a 51-year-old resident of Warrington, Pennsylvania.

12.     Company 1 is a life insurance company based in Springfield, Massachusetts.

13.     Company 2 purported to be a digital content distribution platform that would create and develop its own media, videos, games, and blockchain. Company 2 is based in South Korea.

14.     Company 3 purported to be associated with the mining of two cryptocurrency tokens. Company 3 is based in South Korea and Hong Kong.

15.     Company 4 is a real estate settlement and title insurance company based in the Eastern District of Virginia.

16.     VCE 1 is a cryptocurrency exchange based in San Francisco, California.

17.     VCE 2 is a cryptocurrency exchanged based in the Seychelles.

18.     VCE 3 is a cryptocurrency exchange that does not have an official headquarters.

19.     VCE 4 is a cryptocurrency exchange based in Seattle, Washington.

20.     VCE 5 is a cryptocurrency exchange based in Miami, Florida.

21.     Bank 1 is a bank based in San Francisco, California.

22.     Bank 2 is a bank based in Charlotte, North Carolina.

## BACKGROUND ON VIRTUAL CURRENCY

23.     **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency, such as the U.S. dollar. Virtual currencies are not issued by any government- or bank-like traditional fiat currencies, but rather are generated and controlled through computer software. Bitcoin (BTC) and ether (ETH) are currently the most well-

known virtual currencies in use. Tether (USDT) and USD Coin (USDC) are two stablecoins, meaning that their value is pegged to the United States dollar. In other words, one USDT equates to $1 and one USDC also equates to $1.

24.    **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

25.    **Private Key**: Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder of a virtual currency address's private key can authorize a transfer of virtual currency from that address to another address.

26.    **Virtual Currency Wallet**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time. Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted wallets."

27.    **Blockchain**: Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and

maintains records of every transaction for each virtual currency address. There are different blockchains for different types of virtual currencies.

28.     **Blockchain Explorer**: These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API[1] and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

29.     **Virtual Currency Exchanges (VCEs)**: VCEs are trading and/or storage platforms for virtual currencies, such as BTC and ETH. Many VCEs store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a single user. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (*i.e.*, Know Your Customer ("KYC") checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

30.     **Blockchain Analysis:** As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (*e.g.*, the BTC blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a 'cluster'). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open-

---

[1] API stands for application programming interface, which is a set of definitions and protocols for building and integrating application software.

source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

31.     In addition to using publicly available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

## PROBABLE CAUSE

32.     I have probable cause to believe that, beginning on a date unknown, but by January 2019, and continuing through at least August 2024, **JIHOON PARK** devised and intended to devise a scheme to defraud individuals, including Victim-1, Victim-2, and Victim-3, by obtaining investments through materially false and fraudulent pretenses, representations, and promises. **PARK** met with Victim-1, Victim-2, and Victim-3 in person, including in the Eastern District of Virginia, and communicated with Victim-1, Victim-2, and Victim-3 through electronic communications and by telephone. As part of the scheme, **PARK** misrepresented the manner in which the funds obtained from defrauded individuals, specifically including Victim-1, Victim-2, and Victim-3, would be used.

33.     According to records obtained from Company 1, **PARK** was employed with Company 1 from approximately October 2013 through no later than June 2023. The Financial Industry Regulatory Authority ("FINRA") terminated **PARK**'s registration as a registered representative of Company 1 as of December 31, 2022. As part of the termination, **PARK** was required to promptly remove references and affiliations with Company 1 from social media platforms, websites and communications. However, even after **PARK** was no longer employed at

Company 1, he misled victims about his employment status with Company 1 to further gain their trust and provide legitimacy to his financial advice.

**I)    Victim-1**

34.    Victim-1 was acquainted with **PARK** for approximately 20 years. **PARK** attended the same church as Victim-1. Victim-1 said she trusted **PARK**.

35.    Victim-1 was awarded approximately $1.6 million in a divorce settlement. In 2021, **PARK** was presented to Victim-1 as someone who could help provide financial advice when Victim-1 received the divorce settlement in approximately April 2022.

36.    In approximately August 2021, Victim-1 met with **PARK** to discuss investments. Victim-1 did not want to invest in stocks due to price fluctuations. **PARK** explained that cryptocurrency was a good investment option. **PARK** explained that there was little risk to Victim-1's investments, claiming that the principal amount would never go away. **PARK** told Victim-1 that she would earn 7% compound interest per month. **PARK** also told Victim-1 that she would be able to withdraw the interest at any time.

37.    From September 2021 through December 2021, **PARK** claimed to help Victim-1 make several transfers for her investment. The transfers occurred by moving money from Victim-1's bank accounts to a VCE 1 account in Victim-1's name. **PARK** and Victim-1 would go to the bank together to initiate the wire transfers from Victim-1's bank account to VCE 1. Victim-1 invested approximately $400,000 at this time. Victim-1 believed that her money was invested with Company 1 and **PARK** told her that Company 1 used VCE 1.

38.    **PARK** instructed Victim-1 to purchase a tablet so that Victim-1 could access an application for her investments. Victim-1 later learned that her investments were associated with Company 2. **PARK** told Victim-1 to not search Company 2 on the internet and to not open her

cryptocurrency applications because it would make the applications susceptible to hackers. Victim-1 rarely checked her accounts. Victim-1 recalled asking **PARK** if Company 2 was a pyramid scheme, and **PARK** stated that it was not. Victim-1 recalled that **PARK** stated Company 2 was associated with Company 1, which it is not.

39.    In April 2022, Victim-1 received the divorce settlement. Victim-1 wanted to purchase a residence with the divorce settlement money. **PARK** advised that it was not a good time to purchase a residence, and that Victim-1 should instead invest in other entities. Based on this advice, Victim-1 moved $1,090,000 to VCE 1. An additional $200,000 transfer from Victim-1 to VCE 1 failed, so **PARK** requested the $200,000 in a cashier's check instead, which he subsequently deposited on May 4, 2022.

40.    Victim-1 reported asking **PARK** in June 2023 if he was still employed with Company 1 and **PARK** responded yes. Victim-1 then called Company 1, who stated that **PARK** no longer worked there.

41.    Victim-1 invested with **PARK** because she thought she could withdraw funds whenever she wanted. When Victim-1 tried to withdraw funds, **PARK** told her that she needed to wait two or three years. Victim-1 has repeatedly asked **PARK** for her money back. To date, **PARK** has provided Victim-1 less than $100,000. Victim-1 was unable to access her own funds because she did not know how to withdraw the funds herself from Company 2.

42.    Victim-1 reported meeting with **PARK** in person and communicating with **PARK** via a 571-area code number ("**PARK**'s phone number"). To communicate, **PARK** and Victim-1

would use the mobile application KakaoTalk[2] and **Park**'s personal email address ("**PARK**'s email address").

43.     I have obtained and reviewed financial records and VCE account records for Victim-1 and **PARK**. Between September 2021 and May 2022, Victim-1 transferred approximately $1,660,000, including $1,460,000 to VCE 1 and $200,000 to Bank 1 account number ending in -6021, in the name of **JI H PARK** ("**PARK**'s Bank 1 Account"). Information provided from Bank 1 confirms the account is owned by **PARK**. Of the money transferred to VCE 1:

    a.  In September 2021, approximately 94 ETH, worth approximately $300,000, was moved via the blockchain to cryptocurrency addresses that appeared to be associated with Company 2.

    b.  In April 2022, approximately 980,000 USDT, worth approximately $980,000, was transferred to VCE 2. Records obtained from VCE 2 indicated that the account that received the deposit was registered with **PARK**'s email address and **PARK**'s phone number. As discussed in further detail below, review of the records obtained from **PARK**'s VCE 2 account was not consistent with the funds being invested on behalf of Victim-1.

44.     A review of **PARK**'s Bank 1 Account indicated that the $200,000 cashier's check from Victim-1 was deposited on or around May 4, 2022. There were no additional deposits or withdrawals from **PARK**'s Bank 1 Account until January 23, 2023, when a cashier's check was made payable to Victim-1. In total, Victim-1 received three cashier's checks from **PARK** totaling

---

[2] KakaoTalk is a mobile messaging application operated by Kakao Corporation, a South Korean internet company.

$94,000 as a return of her investment funds. The only other withdrawal from **PARK**'s Bank 1 Account in 2022 and 2023 was a $4,770 purchase at a luxury retail store located in McLean, Virginia. Based on my review of the financial statements, it did not appear that Victim-1's $200,000 cashier's check was invested.

**II)    Victim-2**

45.    Victim-2 reported speaking with **PARK** in person, including in the Eastern District of Virginia, and via KakaoTalk.

46.    In 2023, Victim-2 was introduced to **PARK** as someone associated with Company 3.

47.    **PARK** also introduced himself as an employee of Company 1 and as an investment specialist. Similar to Victim-1, Victim-2 reported that **PARK**'s profile picture associated with his KakaoTalk account was an image of **PARK**'s Company 1 business card, indicating that **PARK** is a Managing Partner. **PARK** further indicated that one of the locations Victim-2 and **PARK** met at was the first floor of Company 1. Victim-2 stated that he trusted **PARK** because of the information that **PARK** would have about financial markets due to **PARK**'s job with Company 1.

48.    In March 2023, a $95,000 check from Victim-2 was deposited into **PARK**'s Bank 1 Account. Victim-2 understood this check to be an investment related to cryptocurrency. Victim-2 provided the check to his neighbor. A review of **PARK**'s Bank 1 Account indicated that the $95,000 check from Victim-2 was deposited on or around March 20, 2023. After the deposit from Victim-2, the only other withdrawals from **PARK**'s Bank 1 Account in 2023 totaled less than $80,000 and comprised of funds being returned to Victim-1 and a purchase at a luxury retail store located in McLean, Virginia. The next withdrawal from **PARK**'s Bank 1 Account was in or around September 2024 and comprised of a $700,000 purchase at Company 4 associated with the purchase

of **PARK**'s residence. Based on my review of the financial statements, it did not appear that Victim-2's $95,000 check was invested in cryptocurrency.

49.      In or around August 2024, **PARK** told Victim-2 that **PARK** had an investment opportunity for Victim-2, and Victim-2 needed to act quickly to take advantage of it. **PARK** indicated that an investment portfolio associated with the investment would be provided at a later date. **PARK** indicated that there would be a high rate of return. At the end of August 2024, Victim-2 invested $300,000 with **PARK**. At the time, Victim-2 still believed **PARK** worked at Company 1 but this was over one year after **PARK**'s employment with Company 1 ended. Victim-2 stated that he would not have made this investment with **PARK** if **PARK** did not work for Company 1.

50.      After investing, Victim-2 began to ask **PARK** for documentation associated with the investment. **PARK** indicated that the investment portfolio would include investments in: (i) ETF's / the S&P 500, (ii) real estate, and (iii) cryptocurrency. **PARK** provided, in part, the following documentation to Victim-2 to memorialize the investment:



51.      **PARK** told Victim-2 that Victim-2 could withdraw funds at any time. As recently as January 2025, Victim-2 tried to use **PARK**'s offer to withdraw their funds. **PARK** has not provided any funds to Victim-2.

52.     On or around August 31, 2024, **PARK** deposited Victim-2's $300,000 check into Bank 2 account number ending in -5371, in the name of **PARK**'s spouse and **JI HOON PARK** ("**PARK**'s Bank 2 Account"). The balance in **PARK**'s Bank 2 Account was less than $70,000 prior to the deposit from Victim-2. On or around September 12, 2024, $300,000 was transferred, via check, from **PARK**'s Bank 2 Account to **PARK**'s Bank 1 Account. Around that time, **PARK**'s Bank 2 Account received less than $3,000 in other deposits between the deposit of Victim-2's investment check and the transfer of $300,000 to **PARK**'s Bank 1 Account. On September 23, 2024, **PARK**'s Bank 1 Account wired $700,000 to Company 4 associated with the purchase of **PARK**'s residence. The balance in **PARK**'s Bank 1 Account was less than $5,000 after the transfer to Company 4.

### III)    Victim-3

53.     Victim-3 reported investing approximately $900,000 with **PARK** in late 2018 and early 2019, which **PARK** represented to Victim-3 as an investment into stocks that had not yet gone public. **PARK** told Victim-3 that it would be a three-year investment, the principle was guaranteed, and that Victim-3 would earn 20% interest. Victim-3 did not believe these investments were in cryptocurrency and would not have invested in cryptocurrency at that time. Approximately one year before this investment was supposed to mature, **PARK** told Victim-3 that COVID-19 delayed the investments, and they would not be repaid until 2025. A review of **PARK**'s Bank 1 Account indicated that a $300,000 wire transfer from Victim-3 was deposited on January 17, 2019. On the same day, a $270,000 outgoing wire to **PARK**'s account at VCE 1 was conducted. The balance in **PARK**'s Bank 1 Account prior to the deposit from Victim-3 was less than $30,000, indicating that the transfer to VCE 1 was comprised of Victim-3's funds. A review of **PARK**'s VCE 1 account indicated that between October 2018 and December 2018, **PARK**'s VCE 1 account

received $582,480 in additional deposits from **PARK**'s Bank 1 Account. Together, the approximately $850,000 moved from **PARK**'s Bank 1 Account to **PARK**'s VCE 1 account between October 2018 and January 2019 is consistent with the time period that Victim-3 indicated she invested $900,000 with **PARK**.

54.     In March 2023, Victim-3 invested an additional $125,000 with **PARK**. Victim-3 understood from **PARK** that this was a five-year investment in cryptocurrency. Prior to this investment, Victim-3 had the funds in an account at Company 1, where **PARK** was her account manager. **PARK** told Victim-3 she should move the funds from Company 1 to a cryptocurrency investment suggested by **PARK**. Victim-3, with **PARK**'s assistance, cashed out her Company 1 account to her bank account, and then obtained cashier's checks payable to **PARK** for this investment.

55.     When Victim-3 asked **PARK** for statements or information associated with how the investments were doing, **PARK** indicated he could not provide that information since it was a group investment. Victim-3 was not provided a contract for the investments.

56.     **PARK** explained the cryptocurrency investment opportunity to Victim-3 in his Company 1 office. **PARK** did not provide many details of Victim-3's investments through KakaoTalk, text message, or email. **PARK** primarily communicated information associated with Victim-3's investment verbally.

57.     Financial analysis related to the $125,000 transfer from Victim-3 in March 2023 did not indicate that the funds were used to invest in cryptocurrency, as **PARK** had promised. Instead, the funds remained idle in **PARK**'s Bank 1 Account until September 2024, when they were combined with funds from Victim-1 and Victim-2 and used to purchase **PARK**'s residence.

**IV)    Financial Analysis Associated with PARK**

58.    Financial analysis conducted to date associated with **PARK**'s bank accounts and VCE accounts indicates that investor funds did not appear to be used for the benefit of the investors. At times, the funds moved through a series of accounts associated with **PARK** and **PARK**'s spouse. Financial analysis conducted to date indicates that investor funds primarily appeared to fund the purchase of the **PARK**'s residence and cryptocurrency stored within unhosted addresses inaccessible to victims.

*PARK's Bank 1 Account*

59.    Prior to January 14, 2019, **PARK**'s Bank 1 Account had a balance less than $30,000. From January 14, 2019 through November 26, 2024, **PARK**'s Bank 1 Account received $1,098,400 in deposits, as outlined below:

a.    $425,000 from Victim-3.

b.    $300,000 from **PARK**'s Bank 2 Account. As further described in paragraph 52, this deposit appears to have derived from Victim-2's investment funds.

c.    $200,000 from Victim-1.

d.    $95,000 from Victim-2.

e.    $66,400 in cash deposits. Review of the cash deposits indicated that they were structured to be under $10,000, avoiding the filing of Currency Transaction Reports. For example, $9,000 was deposited in cash each day on March 22, 2023, March 23, 2023, March 24, 2023, March 27, 2023, March 28, 2023, and March 29, 2023. Additionally, on June 11, 2024, an $8,900 cash deposit was conducted at 02:41:13 p.m. and less than one minute later at 02:41:59 p.m. another $3,500 cash deposit was conducted at the same location in Fairfax, VA.

      f.    $12,000 from S.J.. The memo lines of the checks indicated they related to cryptocurrency coins, which appears to indicate that the checks were intended to be invested.

60.     In total, between January 14, 2019 and September 2024, **PARK**'s Bank 1 Account appeared to receive over $1,000,000 in investor funds. These funds primarily appeared to be used for **PARK**'s benefit. From January 14, 2019 through November 26, 2024, **PARK**'s Bank 1 Account conducted approximately $1,127,000 in withdrawals, including the below:

      a.    $700,000 to Company 4 associated with the **PARK**'s residence.

      b.    $270,000 to **PARK**'s VCE 1 account.

      c.    $94,000 to Victim-1.

      d.    $45,000 to Company 1.

      e.    $5,200 in cash withdrawals.

      f.    $4,770 to a luxury retail store.

61.     The balance in **PARK**'s Bank 1 Account on May 1, 2022, was less than $5,000. Deposits into **PARK**'s Bank 1 Account after that date totaled $798,400. Of those deposits, $720,000 derived directly or indirectly from Victim-1, Victim-2, and Victim-3. Accordingly, such funds necessarily comprised the bulk of **PARK**'s transfer to Company 4 in service of the purchase of his residence.

62.     Company 4's records indicated that on September 30, 2024, **PARK** and **PARK**'s spouse purchased **PARK**'s residence for $1,235,000. The property purchased was financed with $700,000 from **PARK**'s Bank 1 Account and a $535,000 mortgage. **PARK** and **PARK**'s spouse are both listed on the Deed of Trust associated with **PARK**'s residence.

*PARK's VCE 1 Account*

63.    On January 17, 2019, **PARK**'s VCE 1 account received $270,000 from **PARK**'s Bank 1 Account. These funds derived from Victim-3's $300,000 deposit on January 17, 2019. The balance in **PARK**'s Bank 1 Account prior to the deposit from Victim-3 was less than $30,000. No other deposits were received prior to the $270,000 withdrawal to **PARK**'s VCE 1 account.  From there, the funds were converted to cryptocurrency and moved in a manner that appeared designed to conceal the source of the funds, as described below:

a.    On January 27, 2019, $269,990 was converted to 269,990 USDC. On that same date, 269,990 USDC was sent to J.K.'s VCE 3 account.

b.    On January 28, 2019, J.K.'s VCE 3 account converted approximately 269,835 USDC into approximately 77.43 BTC. On September 5, 2019, approximately 1 BTC was sent to **PARK**'s VCE 4 account. On September 7, 2019, approximately 76.35 BTC was sent to **PARK**'s VCE 4 account.

c.    On January 3, 2020, **PARK**'s VCE 4 account sent approximately 77.35 BTC to **PARK**'s VCE 5 account.

d.    On June 13, 2020, **PARK**'s VCE 5 account sent two transactions, totaling approximately 77.35 BTC, back to **PARK**'s VCE 1 account. **PARK**'s VCE 1 account had a balance of approximately 36 BTC prior to these transactions.

e.    On June 14, 2020, **PARK**'s VCE 1 account sent approximately two transactions, totaling approximately 40.1 BTC to J.K.'s VCE 1 account. J.K.'s VCE 1 account had a balance of approximately 10.5 BTC prior to these transactions.

f.    Between December 25, 2021 and January 4, 2022, **PARK**'s VCE 1 account sent approximately 50 BTC to 10 unhosted addresses. On October 12, 2022, **PARK**'s

VCE 1 account sent approximately 23.34 BTC to another unhosted address. Blockchain analysis indicates these funds did not move from the addresses initially funded until April 8, 2025.

g.  Between December 25, 2021 and January 5, 2022, J.K.'s VCE 1 account sent approximately 51.5 BTC to 11 unhosted addresses. Blockchain analysis indicates these funds did not move from the addresses initially funded until April 8, 2025.

h.  On April 8, 2025, the unhosted addresses holding the bitcoin derived from **PARK**'s VCE 1 Account and J.K.'s VCE 1 account consolidated into four new unhosted addresses.

64.    Thus, approximately 77 BTC, estimated to be now worth over $6 million,[3] held in unhosted addresses directly funded by **PARK**'s VCE 1 account and J.K.'s VCE 1 account appeared to derive from funds provided by Victim-3. The flow of funds described above is depicted below[4]:

---

[3] As of April 2, 2025, CoinMarketCap indicated that 1 BTC equated to approximately $84,000.

[4] The amounts shown are approximations. The graphic does not represent all activity associated with the accounts.



***PARK's VCE 2 Account***

65.    On April 20, 2022, approximately 979,667 USDT was moved from Victim-1's VCE 1 account to to **PARK**'s VCE 2 account. Records from VCE 2 showed that **PARK**'s VCE 2 account only received one additional deposit in 2022—approximately 909 Company 2 cryptocurrency tokens. In 2022, **PARK**'s VCE 2 account conducted the following transactions, in part:

a.  Converted approximately 161,000 USDT to approximately 62,812 Company 2 cryptocurrency tokens. As of April 7, 2025, blockchain analysis indicates that these funds went to the same unhosted address and that the funds have not moved. These funds are estimated to now be worth less than $15.[5]

b.  Converted approximately 75,000 USDT to approximately 52 ETH. Blockchain analysis indicates that approximately 51.1 ETH went to the same unhosted address and that the funds did not move until April 8, 2025. These funds are estimated to now be worth approximately $95,000.[6]

c.  Converted approximately 75,000 USDT to approximately 202,000 Ripple (currency code: XRP), another type of virtual currency. Blockchain analysis indicates that approximately 195,000 XRP[7] went to the same unhosted address and that the funds did not move until April 8, 2025. These funds are estimated to now be worth approximately $400,000.[8]

66.  **PARK**'s VCE 2 account records did not indicate activity consistent with investing Victim-1's funds.

---

[5] As of April 2, 2025, CoinMarketCap indicated that 1 Company 2 cryptocurrency token equated to approximately $0.0002.

[6] As of April 2, 2025, CoinMarketCap indicated that 1 ETH equated to approximately $1,800.

[7] Some of the withdrawals occurred in 2023. However, **PARK**'s VCE 2 account records indicated no deposits were received in the form of XRP and that no additional conversions to XRP occurred.

[8] As of April 2, 2025, CoinMarketCap indicated that 1 XRP equated to approximately $2.

## CONCLUSION

67.    Between January 2019 and September 2024, **PARK** received over $1 million directly from Victim-1, Victim-2, and Victim-3 into bank accounts controlled by **PARK**. In addition, **PARK** directed Victim-1 to move over $1.4 million to a VCE 1 account in her name. Approximately $1 million of those funds were sent directly to **PARK**'s VCE 2 account. **PARK**'s financial records indicate that instead of investing the funds on behalf of the investors, **PARK** purchased a house and appears to be storing the equivalent of millions of dollars in unhosted wallets. Victims have reported being unable to withdraw or recover their funds from **PARK** during this time period.

68.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that on or about May 4, 2022, in the Eastern District of Virginia and elsewhere, the defendant **JIHOON PARK**, for the purpose of executing and in furtherance of the above-described scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly cause to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds—to wit, the deposit of a $200,000 check from Victim-1 at Bank 1 located in the Eastern District of Virginia and processing into **PARK**'s Bank 1 Account—in violation of Title 18 U.S.C. §§ 1343 and 2 (Wire Fraud).

69.    Therefore, I respectfully request that the Court issue the proposed criminal complaint and an associated arrest warrant for **PARK**.


Respectfully submitted,

SAMANTHA
WENDT

Digitally signed by SAMANTHA
WENDT
Date: 2025.04.11 12:09:43 -04'00'

Samantha Wendt
Special Agent
Federal Bureau of Investigation


Subscribed to and sworn before me in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 15th day of April 2025.


_William E. Fitzpatrick_

Hon. William E. Fitzpatrick
United States Magistrate Judge

21